## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **(1) ERIC MENENDEZ,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **(1) CAPITAL ONE BANK (USA), N.A,** | ) | **JURY TRIAL DEMANDED** |
| **(2) RAUSCH STURM LLP.** | ) | |
| | ) | |
| **Defendants.** | ) | |

## COMPLAINT

Plaintiff Anthony Menendez ("Plaintiff"), by and through his undersigned counsel, files this Complaint against Defendants Capital One Bank (USA), N.A. ("Capital One") and Rausch Sturm LLP ("Rausch Sturm") (collectively, "Defendants"), and alleges as follows:

## INTRODUCTION

1.      A fraudster opened a Capital One credit card account using Plaintiff's stolen identity, racking up thousands in charges he never made—yet Capital One denied his fraud claims *for over two years* despite clear evidence like police reports and proof the purchases happened in California while he was in Oklahoma. Even worse, after Plaintiff sent Capital One's debt collection law firm 21 pages of solid proof showing the account was fraudulent (the same documents and information Plaintiff had previously

provided Capital One numerous times), Capital One **filed a lawsuit against Plaintiff** for the fraudulent account and served Plaintiff with a Summons. That case is still dragging on in Oklahoma County court today.

2.     This Complaint stems from the shocking and deliberate wrongdoing by the Defendants, who refused to recognize the Plaintiff as a victim of identity theft on a fraudulent Capital One credit card account. Despite strong proof given over two years— like police reports, FTC affidavits, evidence that the charges could not have been made by the Plaintiff due to location differences, identification of possible fraudsters in Defendants' own systems prior to contacting Plaintiff, and subsequent corrections by credit bureaus after Plaintiff's disputes—Capital One kept denying the disputes and provided Plaintiff with over 10 letters saying they had investigated his complaint but each time responding that they had come to the conclusion that the debt was his—essentially accusing him of lying. It sent derogatory information about the fraudulent account to Plaintiff's credit bureaus, causing the bad account to damage his credit, and hired a law firm to collect the invalid debt. Even after receiving solid proof of the fraud, Defendants filed a lawsuit with false claims in Oklahoma County District Court, sent confusing "validation" documents, and blocked discovery requests. This has forced the Plaintiff to fight a baseless case and incur legal costs.

3.     **This federal lawsuit is the Plaintiff's only choice left**, after trying everything else like repeated complaints, reports to the CFPB and OCC, and working in good faith, but getting nowhere except more hassle and rejection. These actions broke federal and Oklahoma laws, hurting the Plaintiff badly. The Plaintiff asks for real

damages, set amounts from the law, punishment damages, court orders to stop the harm, and lawyer fees.

4.      Identity theft hurts millions of people in the U.S. every year, as shown in recent reports from the Federal Trade Commission (FTC) and Consumer Financial Protection Bureau (CFPB). In 2024 alone, over 1.1 million cases were reported, leading to $12.5 billion in losses from fraud and rising emotional pain—like high rates of people thinking about hurting themselves (up to 67.8% in some groups by 2025). The CFPB has pointed out growing anger from consumers over poor handling by lenders and credit agencies, which causes long-lasting credit problems, money troubles, and mental stress. Many victims face this more than once, with up to 31.5% hit multiple times a year. It's vital for this Court to step in, because when lenders ignore facts, it makes these problems worse, breaks trust in the money system, and keeps unfairness going—especially when victims like the Plaintiff end up in pointless court fights despite strong proof of fraud. Strong action is needed to stop these bad behaviors and protect people who are already suffering.

5.      The Fair Debt Collection Practices Act (FDCPA) was passed in 1977 to stop abusive debt collection by outside collectors, make rules fair across states, and protect people from threats or unfair treatment. Congress wanted to keep consumers from being sued for debts they don't owe, through rules like requiring collectors to validate debts when disputed and stop collecting until they prove it's real (15 U.S.C. § 1692g). In cases like this, the FDCPA aims to prevent harm from lies about what someone owes, threats of lawsuits that aren't right, or ignoring valid disputes—which can lead to money

stress, emotional pain, and family problems. The CFPB's 2025 Annual FDCPA Report shows that "attempts to collect debts not owed" is the top complaint, making up about 33% of all FDCPA issues in 2024. Collectors cause big damage with harassment and false claims, and wrong credit reports from ignored disputes—like what happened here—create lasting trouble such as bad credit scores, blocked loans, lost jobs or homes, higher costs, and constant worry, as CFPB reviews point out. This is exactly what happened to the Plaintiff: Even after having already provided Capital One with numerous disputes and documentation over 18 months, when he was first contacted by Capital One's debt collection attorneys, he saw an opportunity to finally stop the madness. He quickly wrote to Rausch Sturm that the account was fraud, sending them all the documents he'd gathered over 18 months of this nightmare, but remarkably, Capital One's lawyers ignored him completely and subsequently filed a lawsuit, showing how the validation process failed. This Court must enforce these laws, because broken rules let unfair systems continue and hurt people's trust in finance.

## **PARTIES**

6.     Plaintiff Eric Menendez is a natural person residing in Jones, Oklahoma.

7.     Defendant Capital One Bank (USA), N.A. is a national banking association headquartered in Virginia, regularly doing business in Oklahoma as a credit card issuer and furnisher of consumer credit information under the FCRA.

8.     Defendant Rausch Sturm LLP is a Wisconsin limited liability partnership headquartered in Brookfield, Wisconsin, regularly engaging in debt collection in

Oklahoma, including through litigation, and qualifying as a "debt collector" under the FDCPA (15 U.S.C. § 1692a(6)).

## JURISDICTION AND VENUE

9.      This Court has federal question jurisdiction under 28 U.S.C. § 1331 and 15 U.S.C. § 1681p (FCRA) and § 1692k(d) (FDCPA). Supplemental jurisdiction exists under 28 U.S.C. § 1367 for state claims arising from the same case or controversy. Diversity jurisdiction under 28 U.S.C. § 1332 may also apply, as the amount in controversy exceeds $75,000 and complete diversity exists (Plaintiff is an Oklahoma citizen; Capital One is Virginia-based; Rausch Sturm is Wisconsin-based).

10.     Venue is proper under 28 U.S.C. § 1391(b) and 15 U.S.C. § 1681p/1692k(d), as Plaintiff resides here, the Fraudulent Account was discovered and disputed here, and the state lawsuit was filed/served here.

## STATEMENT OF FACTS

11.     In approximately January 16, 2023, an unknown fraudster opened a Capital One Quicksilver credit card account ending in ****7829 ("Fraudulent Account"), possibly using Plaintiff's stolen personal information. Plaintiff did not apply for, authorize, receive credentials for, or use the Fraudulent Account, nor did he benefit from any transactions. The Fraudulent Account accumulated charges totaling approximately $7,057.17, primarily from brick-and-mortar purchases in California, while Plaintiff resided exclusively in Oklahoma and made verifiable purchases there on the same dates.

12.     On October 20, 2023, a Capital One representative called Plaintiff inquiring about a suspicious application and requesting additional information for approval.

Plaintiff immediately denied submitting it, declared it fraudulent, and demanded cancellation. The representative assured Plaintiff the application would be canceled, but Capital One failed to do so.

13.    On November 16, 2023, Plaintiff discovered the Fraudulent Account on his Experian credit report with a $7,057.17 balance. This was the first time that plaintiff learned about the fraudulent account. He never received statements, login credentials, or correspondence at his Oklahoma address prior to the date.

14.    Capital One mailed early billing statements (September 9–December 9, 2023) exclusively to the fraudulent California address (XXXXX Mills Ave, Unit XXX, Montclair, CA 91763) and associated phone (818-671-XXXX), both unknown to Plaintiff. Fraudster activity included returned ACH payments ($100 on October 6, 2023; $50 on December 3, 2023), mobile payments ($200 on October 17/25, 2023 from Stride Bank N.A. account ****1520—not Plaintiff's), and purchase adjustments in September 2023 (likely to evade detection). These early red flags should have alerted Capital One to fraud. In fact, it's entirely possible that the call Plaintiff received in October, 2023 was about suspected fraud on this account.  However, what Capital One did next is truly unbelievable.

15.    Upon discovering the fraudulent Capital One account on his Experian credit report, Plaintiff took immediate and thorough steps to protect his credit and dispute the fraud. He contacted Experian right away to initiate a formal dispute, requested that they place a fraud alert and credit freeze on his file, and began reviewing his other credit reports for similar issues. Additionally, he called Capital One to report the fraud and

request more details about the account, which led to them sending him the Identity Fraud

Information Form and FAQ page on November 21, 2023.

16.     On November 21, 2023, Capital One sent Plaintiff an "Identity Fraud

Information Form" and FAQ page explicitly stating its $0 fraud liability policy for proven

unauthorized transactions (FAQ Question 2) and that Plaintiff would not be held

responsible if fraud could not be disproven after complete investigation (Question 5).

Plaintiff received this packet from Capital One on November 25, 2023.

17.     Frustratingly, just two days later after receiving the November 21, 2023

letter enclosing the Capital One's fraud forms, Plaintiff received a new letter from Capital

One dated November 22, 2023, that stated that Capital One had completed its

investigation, and found no signs of fraud, holding Plaintiff responsible because he

allegedly "benefited from transactions" and "opened and interacted with the account,"

demanding $7,057.

18.     This November 22, 2023 letter began a series of eleven, form denial letters

(November 22, 2023, December 8, 2023, December 12, 2023, December 15, 2023,

February 1, 2024, February 5, 2024, February 13, 2024, February 20, 2024, February 27,

2024, July 11, 2025, and November 17, 2025), each ignoring Plaintiff's submissions and

repeating that charges would appear on his "next billing statement" (ironic, as Plaintiff

never received statements).

19.     Plaintiff acted quickly and thoroughly to prove the fraud. On November 27,

2023, he called  Capital One to ask them to re-open the investigation.

20.     The next day, November 28, he sent a detailed dispute letter that included his Experian report showing payment attempts made by the fraudster. On November 29, he sent another letter asking Capital One for a copy of the fraudulent application. He also went in person to the Jones, Oklahoma Police Department that same day and filed a police report (Report #2023-272), where he explained the full situation, including Capital One's quick denial of his claim.

21.     After receiving the initial denial from Capital One regarding any fraud on his account, the plaintiff was stunned but resolute in his determination to correct the error. Plaintiff acted swiftly and comprehensively to prove the fraud. On November 27, 2023, he mailed Capital One the completed and notarized fraud form along with a copy of his driver's license.

22.     The following day, November 28, he sent a detailed dispute letter that included his Experian report, which documented payment attempts made by the fraudster.

23.     On November 29, he sent another letter requesting a copy of the fraudulent application. That same day, he visited the Jones, Oklahoma Police Department and filed a police report (Report #2023-272), detailing the full situation, including Capital One's quick denial of his claim.  He called Capital One again who instructed Plaintiff to send an application request letter with his signature, which he did on this same date.

24.     On December 6, 2023, Plaintiff received a phone call from Capital One informing him that it had received his application request letter however it needed two forms of identification before it would release the application to Plaintiff.

25.     On December 7, 2023, Plaintiff faxed a large packet to Capital One's fraud department (successful transmission confirmed to 866-377-1123), including a fax cover letter, his birth certificate, driver's license copy, the completed Capital One fraud application request form, Capital One credit fraud dispute form, and three pages of his Experian credit report.

26.     Later that afternoon, the Plaintiff received a call from a woman who stated that Capital One would not be able to send the original credit card application because the account had been "deemed not fraud." This decision was considered premature, as the faxed documents had not yet been processed by Capital One. Plaintiff explained that he wished to record the conversation in order to ensure all details were accurately captured, but was promptly informed that, according to Capital One's policy, recording was not permitted. The woman quickly thanked the Plaintiff for calling Capital One, then hung up and closed the case, leaving the Plaintiff unable to get a word in.

27.     After that call, the Plaintiff contacted Capital One's fraud department and spoke with a "supervisor" named Brittany. The Plaintiff informed her about the previous conversation, and Brittany confirmed that she had received the Plaintiff's mailed notarized fraud forms along with the included photocopy of the Plaintiff's driver's license. Brittany stated that the documents would be under review and that the Plaintiff would receive a response within 1 to 10 business days, either by phone or by mail.

28.     On December 12, 2023, Plaintiff notarized and mailed a second set of fraud forms back to Capital One. Later that evening, the Plaintiff returned home to find

another letter, dated December 7, 2023, stating that Capital One had determined the Plaintiff owed the debt and that it would appear on the next billing statement.

29.     On December 12, 2023, he sent another fax (successful transmission confirmed at 12:07 PM to the same number) with the completed Identity Fraud Information Form, cover page, and supporting documents.

30.     On December 14, 2023, Plaintiff returned home to find another form "fraud claim denied" letter from Capital One, dated December 8, 2023. Plaintiff called Capital One again, and this time the representative was able to provide details regarding the original fraud application, explaining why she believed Capital One was repeatedly connecting Plaintiff to the debt. Apparently, there was an incorrect address and phone number on the Plaintiff's credit reports that did not belong to him. Consequently, the Plaintiff contacted all three bureaus and Lexis Nexis to request the removal of those incorrect details and asked Capital One to once again reopen its investigation.

31.     On December 14, 2023, the Plaintiff called the Capital One fraud resolutions department to gather more information regarding the issue. During the phone call with Plaintiff, a Capital One Fraud Specialist revealed four unknown names associated with the account, none whom were known by Plaintiff.

32.     Plaintiff kept disputing the inaccurate information on his credit reports. Experian removed a fraudulent 818-area-code phone number on December 15, 2023, multiple Capital One inquiries on December 19, 2023, and four fraudulent California addresses on December 14, 2023. Equifax removed a fraudulent California address on

December 22, 2023. It is believed that this inaccurate "identification" information was actually provided to the credit reporting agencies by Capital One itself.

33.    Experian initially resolved Plaintiff's dispute by removing the fraudulent Capital One tradeline from his credit report. However, on January 30th, 2024, Capital One reinserted this tradeline. In an email, Experian explained that the request to block this information was based on a material misrepresentation. It was also acknowledged in writing that the information was incorrectly blocked. Plaintiff asserts that Capital One knowingly obtained, or should have known that it obtained, goods, services, or money as a result of the blocked transactions.

34.    Plaintiff again disputed the fraudulent account with Experian. However, Capital One "verified" the dispute to Experian as "accurate," so the reinserted, fraudulent account remained on Plaintiff's Experian credit report.

35.    On February 1, 2024, Plaintiff spoke to a woman in the Capital One Fraud Resolutions Department, as recommended by a Capital One representative the day before, to follow up on the case. Plaintiff was informed that it was waiting for Experian to send it documentation before making a decision. The representative stated that Capital One had received information from TransUnion and Equifax but were still waiting for Experian.

36.    On February 6, 2024, Plaintiff received another form letter dated February 1, 2024, indicating that a decision had been made by Capital One stating that the account was found not to be fraudulent and that he was liable for the debt.

37.    On February 12, 2024, Plaintiff received another form letter dated February 5, 2024, indicating that a decision had been made by Capital One stating that the account was found not to be fraudulent and that he was liable for the debt.

38.    Plaintiff sent two more detailed certified mail disputes to Capital One on February 12, 2024 (received by Capital One February 20) and February 20, 2024 (received February 27), enclosing the FTC affidavit, police report, and side-by-side bank statements proving he was in Oklahoma while fraudulent purchases were made in California, pleading with Capital One to correct this mistake. In his letters, Plaintiff asked that all telephone recordings with Capital One be preserved.

39.    On February 12th, 2024, Plaintiff sent a letter to Experian inquiring about where and how Experian obtained the false address and phone number listed on the credit application. Plaintiff also asked how this information had been reported to them and again requested the removal of the account.

40.    On February 14th, 2024, Plaintiff sent letters to Equifax and TransUnion requesting the same information that was requested in the letter to Experian. Plaintiff spoke to a representative who confirmed that they had received his letter. All letters included three enclosures: Plaintiff's police report, the FTC ID Theft report, and the affidavit submitted to Capital One.

41.    On March 12th, 2024, Plaintiff called Equifax because his credit file information was not visible on its website when logging into his account. The Equifax representative told Plaintiff that there was a security block on the account and that a signed letter, along with a pay stub and a copy of Plaintiff's driver's license, would need

to be mailed in to request the removal of the block. Plaintiff sent the letter on the same day.

42.     On March 20, 2024, Plaintiff received a letter from Equifax regarding the March 12th credit file (confirmation #4072572209) that contained incorrect data. The address listed belonged to the suspect's address in Montclair, California. The date of birth was incorrect, and the last four digits of the SSN were also incorrect. Plaintiff called Equifax to request that this information be corrected, as it was not Plaintiff's. The Equifax representative claimed it was a "technical error" and assured that it would be corrected. He explained that there was another individual with the same name, and the distinction was made by Plaintiff's middle name. The credit file for ERIC ANTHONY MENENDEZ had the correct information, while the file for ERIC MENENDEZ did not. A dispute number of 240320-19613220 was issued, and Plaintiff was informed that an email confirming the correction would be received within 72 hours.

43.     On March 25th, 2024, Plaintiff spoke with a supervisor at Equifax, who explained that the technical team was still working on correcting the technical error regarding the accuracy of Plaintiff's information. The supervisor noted that this dispute inquiry concerning the inaccuracies was originally opened on February 12, 2024 and typically takes 30 days to resolve but can take up to 60 days. Plaintiff was informed that a confirmation email would be sent once the process was completed. The supervisor also stated that Plaintiff's information was listed accurately in their database, and if future lenders check against Equifax, the correct information should display for them, as it would be pulled from the database rather than the credit report.

44.     On April 1, 2024, Plaintiff called Experian and spoke with a representative named Hillary to inquire about the dispute. Hillary informed Plaintiff that investigations are conducted by creditors rather than Experian. When asked who reported the tradeline to Experian, she confirmed that it was Capital One. Plaintiff inquired whether Experian had received the letter, to which Hillary replied that it was received on February 20th. Regarding the actions Experian was taking, Hillary stated that since the Capital One account was not present on Plaintiff's credit report, there was no action to be taken. Plaintiff was also informed that Experian had previously emailed on February 22nd, explaining this situation.

45.     On April 30th, 2024, Plaintiff called Equifax again and spoke with a representative, who stated that they had not sent correspondence to Capital One as requested in Plaintiff's letter. This contradicted the information provided in the letter received from Equifax on February 23, 2024, which indicated that they would forward a copy of the documents Plaintiff had provided to each creditor for their review.

46.     On May 17th, 2024, Plaintiff noted that the suspect had been attempting to make monthly payments of $50, which were below the minimum payment due. On that same day, Plaintiff received a letter from Capital One indicating that the AutoPay service for the fraudulent credit card had been canceled as of May 11, 2024, due to a status change with the credit card account.

47.     On May 31st, 2024, Capital One sent Plaintiff an email from stating that the fraudulent account had been charged off.

48.     Following the charge-off, on June 3, 2024, Capital One sent Plaintiff a collection email regarding the fraudulent account which included a message indicating that it was an attempt to collect the debt and that any information obtained would be used for that purpose.

49.     From June through November 2024, Capital One sent Plaintiff more than 20 additional collection emails demanding payment on the $7,137.17 balance, despite the tremendous effort by Plaintiff to dispute the fraud.

50.     Plaintiff filed four CFPB complaints: January 23, 2025 (#250124-18283550); June 5, 2025 (#250605-21331641, rebuttal with 13 attachments); July 26, 2025 (#250726-22661503, including fraudster names); and July 27, 2025 (#250727-22679669, concerning tradeline reinsertion and geographic proof). Additionally, he filed a complaint with the Office of the Comptroller of the Currency (OCC) that was referred to the CFPB on July 27, 2025. In each instance, the CFPB closed his complaint without further action after receiving Capital One's written response indicating that the matter was deemed closed.

51.     Capital One denied the claims in responses dated March 19 and July 28, 2025, citing the same weak reasons related to "public records." Capital One even threatened to re-insert the fraudulent account onto Plaintiff's credit report if the account were to remain unpaid (a false threat as the account never re-appeared on his reports). Despite Plaintiff's efforts to address the issues, the responses he received from the creditor did not provide the resolution he sought.

52.     On April 14, 2025, Rausch Sturm, a national debt collection firm operating in multiple states including Oklahoma, sent Plaintiff a dunning letter demanding payment of $7,137.17. This letter, the initial letter from debt collector Rausch Sturm, provided Plaintiff until May 27, 2025, to dispute the amount being claimed against him by Capital One.

53.     In response to this demand, Plaintiff engaged legal counsel, who, on April 29, 2025, sent the Rausch Sturm law firm a detailed letter reiterating that the account in question was fraudulent.

54.     Rausch Sturm subsequently responded to Plaintiff's attorney with a letter dated May 23, 2025, requesting that Plaintiff submit a detailed fraud affidavit along with additional personal information.

55.     On June 5, 2025, Plaintiff submitted another complaint to the CFPB regarding Capital One (Complaint 250605-21331641), rebutting their March 19, 2025 letter, which incorrectly concluded that Plaintiff owed the debt. Plaintiff felt it was important to include all relevant information regarding the case to ensure that it reached both the CFPB and Capital One's legal department, which appeared not to have received it previously.

56.     On June 9, 2025, Plaintiff submitted a complaint form to the Social Security Administration regarding an unidentified individual that had been using Plaintiff's social security number for employment in the state of California.

57.     On July 11, 2025, Capital One mailed an identical letter to both Plaintiff

and his legal counsel that stated that Capital One finished its investigation of Plaintiff's

fraud claim and that, again, its "research found no signs of fraud."

58.     On July 21st, 2025, Plaintiff submitted a complaint to the Office of the

Comptroller of the Currency, referenced as OCC Complaint Case CS0388992.

59.     On July 22, 2025, Plaintiff completed the requested the new fraud affidavit

and sent it via USPS Certified Mail to Rausch Sturm along with over 100 pages of

supporting documentation, including an FTC report and a police report. Plaintiff also

faxed the same documents to Rausch & Sturm. The certified letter was received by

Rausch Sturm on July 25, 2025.

60.     On July 24th, 2025, Plaintiff received a letter from the OCC regarding

complaint #CS0388992. The letter stated that Plaintiff's complaint was against a financial

institution with an asset size over $10 billion, and that the regulation in question falls

under the primary responsibility of the CFPB. As a result, the OCC referred the

complaint to the CFPB.

61.     Ignoring Plaintiff's affidavit, less than two weeks later, Rausch Sturm filed

a lawsuit against Plaintiff on August 4, 2025, in Oklahoma County District Court,

claiming he opened and used the fraudulent Capital One account. The Petition included a

sworn statement on July 25, 2025, made under penalty of perjury, saying the claims

against Plaintiff were true. Plaintiff was served with this lawsuit on September 1, 2025.

62.     Plaintiff was forced to hire legal counsel, incurring fees, to assist him in

preparing the Answer document that he filed with the court on September 15, 2025

regarding the fraudulent Capital One debt he did not owe. Counsel also prepared discovery requests related to the fraud, which were served on September 17, 2025. These requests sought specific information about the account and Capital One's investigation. However, as of the date of this complaint, Capital One has not responded to Plaintiff's discovery requests.

63.    On October 13, 2025 and October 14, 2025, Rausch Sturm sent "validation" letters, each comprising 48 pages, that purported to verify the accuracy of the account and claimed Plaintiff's responsibility for the debt. Notably, these letters included account statements that ultimately supported Plaintiff's position, as they revealed that early statements (from September to December 2023) were mailed exclusively to the fraudster's California address, thereby proving that Plaintiff never received them.

64.    On November 17, 2025, Capital One sent Plaintiff's counsel another validation letter, stating once again that there were "no signs of fraud." This letter was received on November 24, 2025.

65.    As of the date of filing this Complaint, the lawsuit against Plaintiff in Oklahoma County initiated by Capital One regarding the fraudulent account remains pending. The lawsuit seeks a judgment finding Plaintiff responsible for the debt associated with the account, despite his consistent assertions of fraud.

66.    All of this has caused Plaintiff significant harm, including over 100 hours spent battling these fraudulent claims and hundreds of dollars in costs for postage, printing, and credit monitoring services like LifeLock. The emotional toll has been immense, leading to restless nights marked by worry and frustration as he fears for his

future and the potential impact of the publicly recorded lawsuit on his reputation with prospective employers. The ongoing stress has not only damaged his credit but has also resulted in escalating legal fees as he defends himself against this baseless state lawsuit.

### FIRST COUNT

### Violation of the Fair Credit Reporting Act (15 U.S.C. § 1681s-2(b)) Against Capital One

67.    Plaintiff re-alleges and incorporates all preceding factual allegations as if fully set forth herein.

68.    Capital One's conduct violated the Fair Credit Reporting Act ("FCRA"), which requires furnishers of credit information, upon notice of a dispute from a consumer reporting agency ("CRA"), to: a) conduct a reasonable investigation of the disputed information; b) review all relevant information provided by the CRA or consumer; c) report the results of the investigation to the CRA; and d) correct or delete inaccurate information (15 U.S.C. § 1681s-2(b)(1)(A)–(E)).

69.    Capital One received multiple dispute notices following Plaintiff's disputes made to Experian and Equifax (e.g., tradeline deletions December 2023–March 2024) and directly from Plaintiff (e.g., November 28, 2023; February 12 and 20, 2024; CFPB complaints forwarded in 2025). Despite this, Capital One: a) failed to conduct a reasonable investigation; b) ignored overwhelming evidence of fraud, including the police report, FTC affidavit, geographic impossibility (Oklahoma vs. California transactions), and mixed or fraudulent addresses; c) issued repeated boilerplate denials,

confirming the fraudulent tradeline; and d) reinserting the tradeline on February 1, 2024, after Experian had properly deleted it following Plaintiff's verified dispute.

70.     Capital One's reinsertion constitutes an additional and separate FCRA violation. Each act of reinsertion of inaccurate information is independently actionable and demonstrates willful disregard for Plaintiff's rights.

71.     By failing to review all relevant information, misrepresenting the results of its investigation to the CRAs, and continuing to report inaccurate information, Capital One willfully and recklessly violated 15 U.S.C. § 1681s-2(b).

72.     As a direct and proximate result of Capital One's violations, Plaintiff suffered actual damages, including but not limited to: a) out-of-pocket expenses for postage, printing, credit monitoring (including LifeLock), and legal advice; b) over 100 hours of lost time disputing fraudulent information; c) damage to credit reputation and creditworthiness; and d) emotional distress, embarrassment, humiliation, anxiety, and frustration caused by repeated "brick wall" responses from Capital One and inaccurate reporting to CRAs.

73.     Capital One's conduct was willful and reckless, entitling Plaintiff to: a) actual damages; b) statutory damages of up to $1,000 per violation (§ 1681n); c) punitive damages; d) costs and reasonable attorney's fees; and e) such other and further relief as the Court deems just and proper.

74.     Each failure to investigate, each misrepresentation to a CRA, and each reinsertion of the fraudulent tradeline constitutes a separate, actionable violation of the FCRA, for which Plaintiff seeks full statutory and punitive damages.

## SECOND COUNT

### Violation of the Fair Debt Collection Practices Act (15 U.S.C. § 1692e) Against Rausch Sturm

75.    Plaintiff re-avers and incorporates all other factual allegations set forth in this Complaint.

76.    The debts sought to be collected were defaulted, consumer debts, including food purchases, consumer electronic purchases, and other consumer items.

77.    Rausch Sturm's conduct violated the Fair Debt Collection Practices Act (FDCPA), which prohibits debt collectors from using any false, deceptive, or misleading representation or means in connection with debt collection (15 U.S.C. § 1692e).

78.    Rausch Sturm falsely represented the character, amount, and legal status of the debt in its April 14, 2025 dunning letter, the August 4, 2025 lawsuit petition (verified under penalty of perjury despite knowledge of fraud), and October 13/14, 2025 validation letters (showing early statements mailed to fraudulent California address, contradicting claims Plaintiff opened/used the account).

79.    Rausch Sturm's actions—ignoring the July 22, 2025, 21-page fraud packet (including police report, FTC affidavit, and credit reports showing tradeline removal) then filing and prosecuting the lawsuit—were deceptive and misleading, as they implied a valid debt despite clear, overwhelming evidence of identity theft.

80.    As a result of Rausch Sturm's violations of the FDCPA, Plaintiff suffered actual damages, including but not limited to: legal fees for state court defense; emotional distress, embarrassment, humiliation, and frustration from baseless litigation.

81.     Rausch Sturm's conduct was willful and reckless, entitling Plaintiff to actual damages, statutory damages up to $1,000 (15 U.S.C. § 1692k), costs, attorney fees, and such other relief as deemed appropriate.

82.     Rausch Sturm's conduct additionally violated 15 U.S.C. § 1692f  of the FDCPA, which prohibits debt collectors from using unfair or unconscionable means to collect or attempt to collect any debt (15 U.S.C. § 1692f).

83.     Rausch Sturm unfairly pursued collection by filing the August 4, 2025 lawsuit after receiving irrefutable fraud evidence, providing self-contradictory validation (mixed addresses), sending duplicate letters (October 13/14), and stonewalling September 17, 2025 discovery requests (unanswered as of December 19, 2025).

84.     These acts were unconscionable, as Rausch Sturm knew or should have known the debt was invalid based on the police report, geographic proof, and Capital One's own statements showing California mailings, yet proceeded to harass Plaintiff through litigation.

85.     As a result of Rausch Sturm's violations of the FDCPA, Plaintiff suffered actual damages, including but not limited to: legal fees for state court defense; emotional distress, embarrassment, humiliation, and frustration from baseless litigation.

86.     Rausch Sturm's conduct was willful and reckless, entitling Plaintiff to actual damages, statutory damages up to $1,000 (15 U.S.C. § 1692k), costs, attorney fees, and such other relief as deemed appropriate.

87.    Rausch Sturm's conduct violated the FDCPA, which requires debt collectors to cease collection if the consumer disputes the debt in writing within 30 days until verification is obtained and mailed (15 U.S.C. § 1692g(b)).

88.    Plaintiff timely disputed via the July 22, 2025 packet (post-April 14 dunning), providing comprehensive fraud evidence, but Rausch Sturm continued collection by filing the August 4, 2025 lawsuit without proper verification (October validation contradicted its claims with California addresses).

89.    Rausch Sturm's failure to cease and provide accurate verification was unfair, as it ignored evidence like the police report and FTC affidavit, proceeding despite knowledge the debt was disputed as fraudulent.

90.    As a result of Rausch Sturm's violations of the FDCPA, Plaintiff suffered actual damages, including but not limited to: legal fees for state court defense; emotional distress, embarrassment, humiliation, and frustration from baseless litigation. Rausch Sturm's conduct was willful and reckless, entitling Plaintiff to actual damages, statutory damages up to $1,000 (15 U.S.C. § 1692k), costs, attorney fees, and such other relief as deemed appropriate.

## SIXTH COUNT

### Violation of the Fair Credit Billing Act (FCBA), 15 U.S.C. § 1666 – Procedural Violations Against Capital One

91.    Plaintiff re-avers and incorporates all other factual allegations set forth in this Complaint.

92.     The Fair Credit Billing Act (FCBA), 15 U.S.C. § 1666, requires creditors of open-end credit accounts, upon receipt of a timely written notice of a billing error, to:

(a) acknowledge the dispute in writing within 30 days;

(b) conduct a reasonable investigation of the disputed charges; and

(c) within 90 days (or two billing cycles, whichever is shorter), either correct the billing error or provide a written explanation of why the creditor believes the billing statement is correct.

93.     Plaintiff timely notified Capital One of the billing error—the entire account and associated charges were unauthorized due to identity theft—via multiple written disputes, including correspondence dated November 28, 2023; February 12, 2024; February 20, 2024; and CFPB complaints.

94.     Capital One failed to comply with its obligations under the FCBA by:

(a) failing to conduct a reasonable investigation;

(b) issuing conclusory, boilerplate denials that ignored Plaintiff's evidence of fraud, geographic impossibility, and police/FTC reports;

(c) failing to correct or remove unauthorized charges;

(d) continuing to assess finance charges, fees, and amounts allegedly due; and

(e) continuing to treat the account as valid and delinquent despite clear notice that it was unauthorized.

95.     While Plaintiff's disputes were pending, Capital One violated 15 U.S.C. § 1666(a)(3)(B) by engaging in collection activity, including:

(a) demanding payment from Plaintiff;

(b) assessing late fees and penalty APRs;

(c) reporting the account as delinquent to credit reporting agencies; and

(d) filing a collection lawsuit.

96.     Capital One further violated 15 U.S.C. § 1666(a)(3)(B)(ii) by failing to provide a clear, meaningful written explanation of the basis for its denials, issuing at least eleven (11) repetitive letters that did not identify the evidence relied upon or explain why the charges were allegedly authorized.

97.     As a direct and proximate result of these procedural violations, Plaintiff suffered actual damages, including: out-of-pocket expenses exceeding $500; over 100 hours addressing the fraudulent account and disputes; harm to credit reputation and creditworthiness; and emotional distress, embarrassment, humiliation, and frustration.

98.     Capital One's conduct was willful, knowing, and reckless, entitling Plaintiff to: actual damages, statutory damages equal to twice the finance charge, costs, attorney's fees, and such other relief as the Court deems appropriate.

## SEVENTH COUNT

### Violation of the Truth in Lending Act (TILA), 15 U.S.C. § 1643 – Substantive Liability Violations Against Capital One

99.     Plaintiff re-avers and incorporates all other factual allegations set forth in this Complaint.

100.    TILA, 15 U.S.C. § 1643, limits a cardholder's liability for unauthorized use of a credit card to $50. If no card was issued or accepted by the consumer, the liability is $0.

101.    The account at issue was opened through identity theft. Plaintiff never authorized the account, received a card, or benefited from the charges.

102.    Capital One nonetheless attempted to hold Plaintiff liable for the full amount of $7,137.17, pursued collection, assessed finance charges and fees, reported the account as delinquent to credit reporting agencies, and filed a collection lawsuit.

103.    Capital One's actions violated TILA because Plaintiff was not liable for any of the charges, and the statutory liability cap was ignored. Capital One also disregarded evidence of non-authorization, including police reports, FTC affidavits, and geographic impossibility.

104.    As a direct and proximate result of these substantive TILA violations, Plaintiff suffered actual damages, including: out-of-pocket expenses exceeding $500; over 100 hours addressing disputes and litigation; harm to credit reputation and creditworthiness; and emotional distress, embarrassment, humiliation, and frustration.

105.    Capital One's violations were willful, knowing, and reckless, entitling Plaintiff to: actual damages, statutory damages under 15 U.S.C. § 1640(a), costs, attorney's fees, and any further relief deemed just and proper.

## EIGHTH COUNT

**Violation of the Oklahoma Consumer Protection Act (15 O.S. §§ 751 et seq.) Against Both Defendants**

106.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

107.    The Oklahoma Consumer Protection Act ("OCPA"), 15 O.S. §§ 752–761.1, prohibits unfair or deceptive acts or practices in the conduct of any consumer transaction, including but not limited to false or misleading representations, deceptive omissions, and unconscionable conduct. 15 O.S. § 753.

108.    At all relevant times, Defendants Capital One and Rausch Sturm were engaged in "consumer transactions" within the meaning of the OCPA, including the extension, servicing, collection, and enforcement of alleged consumer credit obligations, and their conduct was undertaken in the course of trade or commerce.

109.    Capital One deceptively advertised and represented to consumers, including Plaintiff, that it maintained a "zero liability" policy protecting victims of fraudulent and unauthorized charges. Capital One publicly represented using consumer-facing materials, (and privately represented to Plaintiff through its November 21, 2023 FAQ in its letter), that consumers would not be held responsible for fraudulent charges if promptly reported.

110.    Plaintiff reasonably relied on Capital One's representations by timely disputing the account and charges, submitting written disputes, a police report, and objective evidence demonstrating identity theft and geographic impossibility. Notwithstanding these representations, Capital One failed to honor its zero-liability assurances, repeatedly denied Plaintiff's disputes, continued to treat the account as valid, demanded payment, assessed fees and interest, reported delinquency, and initiated or caused the initiation of collection litigation.

111.    Capital One's representations regarding zero liability were false, misleading, or deceptive at the time they were made, or were made with reckless

disregard for whether Capital One would actually honor them in practice, in violation of 15 O.S. § 753(5), (9) and (21).

112.    Defendant Rausch Sturm, acting as Capital One's collection agent and litigation counsel, engaged in deceptive acts and practices by verifying, litigating, and attempting to enforce a debt it knew or should have known was the product of identity theft. Rausch Sturm ignored or failed to meaningfully consider fraud evidence provided by Plaintiff, including inconsistent addresses, identity-theft documentation, and objective indicia that Plaintiff did not open or use the account.

113.    Rausch Sturm further engaged in deceptive practices by providing misleading debt validation and representations regarding the legitimacy of the account, including the use of mixed or inconsistent addresses and account information that did not correspond to Plaintiff, thereby creating a false impression that the debt was valid and enforceable. 15 O.S. § 753(21).

114.    Defendants' conduct was unconscionable within the meaning of the OCPA because they knowingly or recklessly pursued collection and litigation on a debt arising from identity theft, despite overwhelming evidence that Plaintiff did not authorize the account or charges, and despite the foreseeable harm such conduct would cause.

115.    In addition, Defendants violated the OCPA's prohibition against knowingly causing a charge to be made to a consumer for products or services not authorized by the consumer, including by continuing to impose charges, fees, interest, and alleged balances on an account Defendants knew or should have known was unauthorized. See 15 O.S. § 753(26).

116.    Defendants' refusal to acknowledge fraud, combined with their continued pursuit of collection and litigation, constituted deceptive and unfair practices that were likely to mislead a reasonable consumer and did, in fact, cause Plaintiff foreseeable harm, including financial loss, credit damage, and emotional distress.

117.    As a direct and proximate result of Defendants' violations of the OCPA, Plaintiff suffered actual damages, including but not limited to out-of-pocket expenses exceeding $500; loss of more than one hundred (100) hours of time; damage to credit reputation and creditworthiness; and emotional distress, embarrassment, humiliation, anxiety, and frustration.

118.    Defendants' conduct was willful, knowing, and reckless. Pursuant to 15 O.S. §§ 761 and 761.1, Plaintiff is entitled to recover actual damages, civil penalties of up to $2,000 per violation, punitive damages where appropriate, costs, reasonable attorney's fees, and such other and further relief as the Court deems just and proper.

## NINTH COUNT

**Fraudulent Misrepresentation Against Both Defendants**

119.    Plaintiff re-avers and incorporates all other factual allegations set forth in this Complaint.

120.    Defendants' conduct constitutes fraudulent misrepresentation under Oklahoma common law, requiring: (1) a false material misrepresentation; (2) known to be false or made recklessly without knowledge of truth; (3) intent to induce reliance; (4) justifiable reliance; (5) damages.

121.    Capital One falsely represented the account as Plaintiff's (denials, CFPB responses) and its zero liability policy as applicable, knowing or recklessly ignoring fraud evidence. Rausch Sturm falsely represented the debt as valid in the verified lawsuit and validation, knowing from the July 22 packet it was fraudulent.

122.    Defendants intended Plaintiff to rely (e.g., pay or defend invalid debt), and Plaintiff justifiably relied by incurring costs to dispute, suffering harm.

123.    As a result of Defendants' fraudulent misrepresentations, Plaintiff suffered actual damages, including but not limited to: out-of-pocket expenses exceeding $500; over 100 hours of lost time; credit harm; emotional distress, embarrassment, humiliation, and frustration.

124.    Defendants' conduct was willful and reckless, entitling Plaintiff to actual damages, punitive damages, costs, and such other relief as deemed appropriate.

## TENTH COUNT

### Negligent Misrepresentation Against Both Defendants

125.    Plaintiff re-avers and incorporates all other factual allegations set forth in this Complaint.

126.    Defendants' conduct constitutes negligent misrepresentation under Oklahoma common law, requiring: (1) a false statement; (2) made in the course of business; (3) failure to exercise reasonable care in ascertaining truth; (4) justifiable reliance; (5) damages.

127.    Capital One negligently represented the account as valid and zero liability applicable without reasonable investigation of disputes. Rausch Sturm negligently verified the debt in the lawsuit without care, ignoring provided evidence.

128.    Defendants failed reasonable care (e.g., ignoring affidavits, addresses), inducing Plaintiff's reliance and costs.

129.    As a result of Defendants' negligent misrepresentations, Plaintiff suffered actual damages, including but not limited to: out-of-pocket expenses exceeding $500; over 100 hours of lost time; credit harm; emotional distress, embarrassment, humiliation, and frustration.

130.    Defendants' conduct was reckless, entitling Plaintiff to actual damages, punitive damages, costs, and such other relief as deemed appropriate.

## ELEVENTH COUNT

### Abuse of Process Against Both Defendants

131.    Plaintiff re-avers and incorporates all other factual allegations set forth in this Complaint.

132.    Defendants' conduct constitutes abuse of process under Oklahoma common law, requiring: (1) issuance of process; (2) ulterior purpose; (3) willful act in improper use of process.

133.    Defendants issued process by filing and serving the August 4, 2025 lawsuit with ulterior purpose to collect invalid debt and harass, despite fraud evidence.

134.    Defendants' willful, improper acts included perjured verification, contradictory validation, and discovery stonewalling.

135.    As a result of Defendants' abuse of process, Plaintiff suffered actual damages, including but not limited to: legal fees for defense; emotional distress, embarrassment, humiliation, and frustration.

136.    Defendants' conduct was willful and malicious, entitling Plaintiff to actual damages, punitive damages, costs, and such other relief as deemed appropriate.

## TWELFTH COUNT

### Malicious Prosecution Against Both Defendants

137.    Plaintiff re-avers and incorporates all other factual allegations set forth in this Complaint.

138.    Defendants' conduct constitutes malicious prosecution under Oklahoma common law, requiring: (1) initiation of action; (2) termination in Plaintiff's favor; (3) lack of probable cause; (4) malice; (5) damages.

139.    Defendants initiated the lawsuit without probable cause (ignored fraud proof), and with willful disregard, constituting malice.

140.    As a result of Defendants' malicious prosecution, Plaintiff suffered actual damages, including but not limited to: legal fees; emotional distress, embarrassment regarding the public record, humiliation, and frustration.

141.    Defendants' conduct was malicious, entitling Plaintiff to actual damages, punitive damages, costs, and such other relief as deemed appropriate.

## THIRTEENTH COUNT

### Negligence *Per Se* Against Both Defendants

142.    Plaintiff re-avers and incorporates all other factual allegations set forth in this Complaint.

143.    Defendants' conduct constitutes negligence under Oklahoma common law, requiring: (1) duty; (2) breach; (3) causation; (4) damages.

144.    Obligation owed by one person to act so as not to cause harm to another. *See* 76 O.S.2001, § 1

145.    Defendants owed a duty to Plaintiff investigate and collect reasonably as outlined in 76 O.S. Section 1, which states that "every person is bound, without contract, to abstain from injuring the person or property of another, or infringing upon any of his rights." By breaching this duty through unreasonable denials, false credit reporting, and the subsequent lawsuit, they have caused significant harm to Plaintiff.

146.    As a result of Defendants' negligence, Plaintiff suffered actual damages, including but not limited to: out-of-pocket expenses exceeding $500; over 100 hours of lost time; credit harm; emotional distress, embarrassment, humiliation, and frustration.

147.    Defendants' conduct was reckless, entitling Plaintiff to actual damages, punitive damages, costs, and such other relief as deemed appropriate.

## FOURTEENTH COUNT

### Intentional Infliction of Emotional Distress Against Both Defendants

148.    Plaintiff re-avers and incorporates all other factual allegations set forth in this Complaint.

149.    Defendants' conduct constitutes intentional infliction of emotional distress under Oklahoma common law, requiring: (1) intentional/reckless act; (2) extreme/outrageous conduct; (3) causation; (4) severe distress.

150.    Defendants' numerous reckless denials, perjured lawsuit, and obstruction were outrageous, causing severe distress from prolonged harassment.

151.    As a result of Defendants' intentional infliction of emotional distress, Plaintiff suffered actual damages, including but not limited to: emotional distress, embarrassment, humiliation, and frustration.

152.    Defendants' conduct was intentional and reckless, entitling Plaintiff to actual damages, punitive damages, costs, and such other relief as deemed appropriate.

## FIFTEENTH COUNT

### Defamation Against Both Defendants

153.    Plaintiff re-avers and incorporates all other factual allegations set forth in this Complaint.

154.    Defendants' conduct constitutes defamation under Oklahoma common law, requiring: (1) false statement; (2) publication; (3) negligence/malice; (4) damages.

155.    Capital One falsely reported Plaintiff's liability to credit bureaus, and Rausch Sturm echoed this falsehood in both the lawsuit and the validation letters.

156.    Ultimately filing a perjured lawsuit with no way for Plaintiff to remove this lawsuit from viewing by the public on the state court system's website at www.oscn.net. This means that anyone reviewing the site—whether for employment or personal reasons—will inevitably come across this lawsuit, potentially damaging the plaintiff's reputation and credit for the foreseeable future.

157.    As a result of Defendants' defamation, Plaintiff suffered actual damages, including but not limited to: credit harm; emotional distress, embarrassment, humiliation, and frustration.

158.    Defendants' conduct was malicious, entitling Plaintiff to actual damages, punitive damages, costs, and such other relief as deemed appropriate.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Eric Menendez, respectfully prays for judgment against Defendants Capital One Bank (USA), N.A. and Rausch Sturm LLP, jointly and severally, as follows:

A. **On the Fair Credit Reporting Act claim** (15 U.S.C. § 1681s-2(b)) against Capital One:

- Actual damages pursuant to 15 U.S.C. § 1681o;

- Statutory damages of up to $1,000 per violation pursuant to 15 U.S.C. § 1681n;

- Punitive damages for willful noncompliance pursuant to 15 U.S.C. § 1681n;

- Costs of suit and reasonable attorney's fees pursuant to 15 U.S.C. §§ 1681n and 1681o.

B. **On the Fair Debt Collection Practices Act claims** (15 U.S.C. §§ 1692e, 1692f, and 1692g(b)) against Rausch Sturm:

- Actual damages pursuant to 15 U.S.C. § 1692k(a)(1);

- Statutory damages of up to $1,000 pursuant to 15 U.S.C. § 1692k(a)(2)(A);

- Costs of suit and reasonable attorney's fees pursuant to 15 U.S.C. § 1692k(a)(3).

C. **On the Fair Credit Billing Act and Truth in Lending Act claims** (15 U.S.C. §§ 1666, 1666(c), 1640, and 1643) against Capital One:

- Actual damages pursuant to 15 U.S.C. § 1640(a)(1);

- Statutory damages equal to twice the amount of any finance charge pursuant to 15 U.S.C. § 1640(a)(2);

- Declaratory relief that Plaintiff is not liable for the fraudulent account or charges;

- Costs of suit and reasonable attorney's fees pursuant to 15 U.S.C. § 1640(a)(3).

D. **On the Oklahoma Consumer Protection Act claims** (15 O.S. §§ 752–761.1) against both Defendants:

- Actual damages pursuant to 15 O.S. § 761;

- Civil penalties of up to $2,000 per violation pursuant to 15 O.S. § 761.1;

- Punitive damages;

- Costs and reasonable attorney's fees.

E. **On Plaintiff's Oklahoma common-law claims** (fraudulent misrepresentation, negligent misrepresentation, abuse of process, malicious prosecution, negligence per se, and intentional infliction of emotional distress) against both Defendants:

- Compensatory damages;

- Punitive damages for willful, reckless, or malicious conduct;

- Costs and any other relief permitted under Oklahoma law.

F. **Injunctive and equitable relief**, including but not limited to:

- An order requiring Defendants to correct and permanently delete any inaccurate credit reporting related to the fraudulent account;

- An order barring Defendants from further collection, litigation, or reporting activity related to the fraudulent debt.

G. **Such other and further relief** as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Respectfully Submitted,

/s/ Victor R. Wandres
Victor R. Wandres, OBA #19591
Paramount Law
1202 E. 33rd Street
(918) 200-9272 voice
(918) 895-9774 fax
victor@paramount-law.net