EXHIBIT 1

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| ERIC MENENDEZ, | § | |
|     Plaintiff, | § | |
| | § | |
| v. | § | Case No. 5:25-cv-01545-G |
| | § | Hon. Charles B. Goodwin |
| CAPITAL ONE, N.A., and | § | |
| RAUSCH STURM LLP, | § | JURY TRIAL DEMANDED |
| | § | |
|     Defendants. | § | |

## [PROPOSED] FIRST AMENDED COMPLAINT

Plaintiff Eric Menendez ("Plaintiff"), by and through his undersigned counsel, submits this [proposed] First Amended Complaint against Defendants Capital One, N.A. ("Capital One") and Rausch Sturm LLP ("Rausch Sturm") (collectively, "Defendants") pursuant to Federal Rules of Civil Procedure 15(a)(2) and 16(b)(4) and Local Civil Rule 15.1. Upon the Court's granting of leave, this First Amended Complaint will amend, supersede, and replace the original Complaint (Doc. 1) and will be the operative pleading. Plaintiff alleges as follows:

## INTRODUCTION

1. This case is about a bank and a debt collector that, now for 30 months, has chosen to believe an identity thief over the innocent man whose identity was stolen. An impostor in California used Eric Menendez's personal information to open a Capital One credit card that Mr. Menendez never applied for, never received, and never used, and ran up roughly $7,057 in charges he never made. Mr. Menendez has never been, a Capital One accountholder — yet for 25 months the Defendants treated and pursued him as

though he were the obligor on the Account, demanding payment, reporting it against his credit, and ultimately filing a lawsuit against him to collect it.

2.  Mr. Menendez did everything a fraud victim can do. He reported the fraud, filed a police report, obtained an FTC Identity Theft Report, submitted notarized affidavits, and showed that the charges were made in California while he was in Oklahoma. Capital One ignored all of it. Over 25 months Capital One sent him at least eleven *form* letters insisting the debt was his, reported the fraudulent account to the credit bureaus, demanded that the credit reporting agencies reinsert the fraudulent account to Plaintiff's credit reports after the credit reporting agencies deleted their information as fraudulent, charged the account off, and demanded payment again and again.

3.  Capital One then placed the fraudulent debt with its law firm, Rausch Sturm, which—after receiving notice that the account was disputed as fraud from Plaintiff's attorney—sued Mr. Menendez on a *sworn* petition in Oklahoma County, only to dismiss that suit with prejudice once he demanded proof in discovery — but that dismissal did not erase the 25 months of damage and **the fraud has not stopped**: Mr. Menendez continues to receive LifeLock identity-protection alerts that new Capital One accounts are being opened in his name, *apparently by the exact same fraudster,* using the same address where Capital One originally sent account statements.

By this action, Plaintiff seeks actual, statutory, and punitive damages, a declaration that he owes nothing, an injunction against further collection and reporting, and attorney's fees, under the Fair Credit Reporting Act, the Fair Credit Billing Act, the Fair Debt Collection Practices Act, and Oklahoma law for malicious prosecution,

negligence, the unauthorized obtaining of his consumer reports, and intrusion upon seclusion — including an injunction stopping Capital One from continuing to inspect his credit.

4.  Identity theft hurts millions of people in the U.S. every year, as shown in recent reports from the Federal Trade Commission (FTC) and Consumer Financial Protection Bureau (CFPB). In 2024 alone, over 1.1 million cases were reported, leading to $12.5 billion in losses from fraud and rising emotional pain—like high rates of people thinking about hurting themselves (up to 67.8% in some groups by 2025). The CFPB has pointed out growing anger from consumers over poor handling by lenders and credit agencies, which causes long-lasting credit problems, money troubles, and mental stress. Many victims face this more than once, with up to 31.5% hit multiple times a year. It's vital for this Court to step in, because when lenders ignore facts, it makes these problems worse, breaks trust in the money system, and keeps unfairness going—especially when victims like the Plaintiff end up in pointless court fights despite strong proof of fraud. Strong action is needed to stop these bad behaviors and protect people who are already suffering.

5.  The Fair Debt Collection Practices Act (FDCPA) was passed in 1977 to stop abusive debt collection by outside collectors, make rules fair across states, and protect people from threats or unfair treatment. Congress wanted to keep consumers from being sued for debts they don't owe, through rules like requiring collectors to validate debts when disputed and stop collecting until they prove it's real (15 U.S.C. § 1692g). In cases like this, the FDCPA aims to prevent harm from lies about what someone owes, threats of lawsuits that aren't right, or ignoring valid disputes—which can lead to money stress,

emotional pain, and family problems. The CFPB's 2025 Annual FDCPA Report shows that "attempts to collect debts not owed" is the top complaint, making up about 33% of all FDCPA issues in 2024. Collectors cause big damage with harassment and false claims, and wrong credit reports from ignored disputes—like what happened here—create lasting trouble such as bad credit scores, blocked loans, lost jobs or homes, higher costs, and constant worry, as CFPB reviews point out. This is exactly what happened to the Plaintiff: Even after having already provided Capital One with numerous disputes and documentation over 18 months, when he was first contacted by Capital One's debt collection attorneys, he saw an opportunity to finally stop the madness. He quickly engaged legal counsel who wrote to Rausch Sturm that the account was fraud, and then Eric followed up with them directly, sending them all the documents he'd gathered over 18 months of this nightmare, but remarkably, Capital One's lawyers *also ignored him* and subsequently filed a lawsuit, showing how the validation process failed. This Court must enforce these laws, because broken rules let unfair systems continue and hurt people's trust in finance.

## PARTIES

6.  Plaintiff Eric Menendez is a natural person residing in Jones, Oklahoma.

7.  Defendant Capital One, N.A. (named in the original Complaint as "Capital One Bank (USA), N.A.") is a national banking association headquartered in Virginia, regularly doing business in Oklahoma as a credit card issuer and furnisher of consumer credit information under the FCRA.

8.  Defendant Rausch Sturm LLP is a Wisconsin limited liability partnership headquartered in Brookfield, Wisconsin, regularly engaging in debt collection in Oklahoma, including through litigation, and qualifying as a "debt collector" under the FDCPA (15 U.S.C. § 1692a(6)).

## JURISDICTION AND VENUE

9.  This Court has federal question jurisdiction under 28 U.S.C. § 1331 and 15 U.S.C. § 1681p (FCRA) and § 1692k(d) (FDCPA). Supplemental jurisdiction exists under 28 U.S.C. § 1367 for state claims arising from the same case or controversy. Diversity jurisdiction under 28 U.S.C. § 1332 may also apply, as the amount in controversy exceeds $75,000 and complete diversity exists (Plaintiff is an Oklahoma citizen; Capital One is Virginia-based; Rausch Sturm is Wisconsin-based).

10.  Venue is proper under 28 U.S.C. § 1391(b) and 15 U.S.C. § 1681p/1692k(d), as Plaintiff resides here, the Fraudulent Account was discovered and disputed here, and the state lawsuit was filed/served here.

## STATEMENT OF FACTS

11.  On or about August 16, 2023 (actual date unknown to Plaintiff), an unknown fraudster opened a Capital One Quicksilver credit card account ending in ****7829 ("Fraudulent Account"), possibly using Plaintiff's stolen personal information. Plaintiff did not apply for, authorize, receive credentials for, or use the Fraudulent Account, nor did he benefit from any transactions. The Fraudulent Account accumulated charges totaling approximately $7,057.17 — which Capital One and Rausch Sturm later

demanded, with added fees and interest, as $7,137.17, the amount stated in Rausch

Sturm's collection letters and the state-court Petition — primarily from brick-and-mortar

purchases in California, while Plaintiff resided exclusively in Oklahoma and made

verifiable purchases there on the same dates.

12.  On or around October 20, 2023, a Capital One representative called Plaintiff

inquiring about a suspicious application and requesting additional information for

approval. Plaintiff immediately denied submitting it, declared it fraudulent, and

demanded cancellation. The representative assured Plaintiff the application would be

canceled, but Capital One failed to do so.

13.  On November 16, 2023, Plaintiff discovered the Fraudulent Account on his

Experian credit report, with a balance of $7,057.17. This was the first time Plaintiff

learned of the Fraudulent Account. Because the account had been opened using a

California mailing address, Plaintiff did not receive the early billing statements or

account-opening correspondence at his Oklahoma home and therefore had no earlier

opportunity to detect the fraud.

14.  Capital One mailed early billing statements (September 9–December 9, 2023)

exclusively to the fraudulent California address (XXXXX Mills Ave, Unit XXX,

Montclair, CA 91763) and associated phone (818-671-XXXX), both unknown to

Plaintiff. Fraudster activity included returned ACH payments ($100 on October 6, 2023;

$50 on December 3, 2023), mobile payments ($200 on October 17/25, 2023 from Stride

Bank N.A. account ****1520—not Plaintiff's), and purchase adjustments in September

2023 (likely to evade detection). These early red flags should have alerted Capital One to

fraud. In fact, it's entirely possible that the call Plaintiff received in October, 2023 was about suspected fraud on this account. Capital One nonetheless had Plaintiff's correct Oklahoma address on file: it later directed its denial and decision letters, and beginning in 2024 its collection e-mails, to Plaintiff at his home in Jones, Oklahoma—confirming that Capital One knew how to reach the real Eric Menendez even as it continued to treat the California account as his.

15.  Upon discovering the fraudulent Capital One account on his Experian credit report, Plaintiff took immediate and thorough steps to protect his credit and dispute the fraud. He contacted Experian right away to initiate a formal dispute, requested that they place a fraud alert and credit freeze on his file, and began reviewing his other credit reports for similar issues. Additionally, he called Capital One to report the fraud and request more details about the account, which led to them sending him the Identity Fraud Information Form and FAQ page on November 21, 2023.

16.  On November 21, 2023, Capital One sent Plaintiff an "Identity Fraud Information Form" and FAQ page explicitly stating its $0 fraud liability policy for proven unauthorized transactions (FAQ Question 2) and that Plaintiff would not be held responsible if fraud could not be disproven after complete investigation (Question 5). Plaintiff received this packet from Capital One on November 25, 2023.

17.  Frustratingly, just two days later after receiving the November 21, 2023 letter enclosing the Capital One's fraud forms, Plaintiff received a new letter from Capital One dated November 22, 2023, that stated that Capital One had completed its investigation,

and found no signs of fraud, holding Plaintiff responsible because he allegedly "benefited from transactions" and "opened and interacted with the account," demanding $7,057.

18.  This November 22, 2023 letter began a series of eleven, form denial letters (November 22, 2023, December 8, 2023, December 12, 2023, December 15, 2023, February 1, 2024, February 5, 2024, February 13, 2024, February 20, 2024, February 27, 2024, July 11, 2025, and November 17, 2025), each ignoring Plaintiff's submissions and repeating that charges would appear on his "next billing statement."  Plaintiff only received two written billing statements from Capital One over the course of the ordeal which he left unopened until July 21, 2026, when he opened them for the first time upon advice of counsel.

21.  After receiving the initial denial from Capital One regarding any fraud on his account, the Plaintiff was stunned but resolute in his determination to correct the error. Plaintiff acted swiftly and comprehensively to prove the fraud. On November 27, 2023, he mailed Capital One the completed and notarized fraud form along with a copy of his driver's license.

22.  The following day, November 28, he sent a detailed dispute letter that included his Experian report, which documented payment attempts made by the fraudster.

23.  On November 29, he sent another letter requesting a copy of the fraudulent application. That same day, he visited the Jones, Oklahoma Police Department and filed a police report, detailing the full situation, including Capital One's quick denial of his claim. He called Capital One again who instructed Plaintiff to send an application request letter with his signature, which he did on this same date.

24.  On December 6, 2023, Plaintiff received a phone call from Capital One informing him that it had received his application request letter however it needed two forms of identification before it would release the application to Plaintiff.

25.  On December 7, 2023, Plaintiff faxed a large packet to Capital One's fraud department (successful transmission confirmed to 866-377-1123), including a fax cover letter, his birth certificate, driver's license copy, the completed Capital One fraud application request form, Capital One credit fraud dispute form, and three pages of his Experian credit report.

26. Later that afternoon, the Plaintiff received a call from a woman who stated that Capital One would not be able to send the original credit card application because the account had been "deemed not fraud." This decision was considered premature, as the faxed documents had not yet been processed by Capital One. Plaintiff explained that he wished to record the conversation in order to ensure all details were accurately captured, but was promptly informed that, according to Capital One's policy, recording was not permitted. The woman quickly thanked the Plaintiff for calling Capital One, then hung up and closed the case, leaving the Plaintiff unable to get a word in.

27.  After that call, the Plaintiff contacted Capital One's fraud department and spoke with a "supervisor" named Brittany. The Plaintiff informed her about the previous conversation, and Brittany confirmed that she had received the Plaintiff's mailed notarized fraud forms along with the included photocopy of the Plaintiff's driver's license. Brittany stated that the documents would be under review and that the Plaintiff would receive a response within 1 to 10 business days, either by phone or by mail.

28.  On December 12, 2023, Plaintiff notarized and mailed a second set of fraud forms back to Capital One. Later that evening, the Plaintiff returned home to find another letter, dated December 7, 2023, stating that Capital One had determined the Plaintiff owed the debt and that it would appear on the next billing statement.

29. On December 12, 2023, he sent another fax (successful transmission confirmed at 12:07 PM to the same number) with the completed Identity Fraud Information Form, cover page, and supporting documents.

30.  On December 14, 2023, Plaintiff returned home to find another form "fraud claim denied" letter from Capital One, dated December 8, 2023. Plaintiff called Capital One again, and this time the representative was able to provide details regarding the original fraud application, explaining why she believed Capital One was repeatedly connecting Plaintiff to the debt. Apparently, there was an incorrect address and phone number on the Plaintiff's credit reports that did not belong to him. Consequently, the Plaintiff contacted all three bureaus and Lexis Nexis to request the removal of those incorrect details and asked Capital One to once again reopen its investigation.

31.  On December 14, 2023, the Plaintiff called the Capital One fraud resolutions department to gather more information regarding the issue. During the phone call with Plaintiff, a Capital One Fraud Specialist revealed four unknown names associated with the account, none whom were known by Plaintiff.

32.  Plaintiff kept disputing the inaccurate information on his credit reports. Experian removed a fraudulent 818-area-code phone number on December 15, 2023, multiple Capital One inquiries on December 19, 2023, and four fraudulent California

addresses on December 14, 2023. Equifax removed a fraudulent California address on December 22, 2023. Plaintiff alleges that this inaccurate "identification" information was actually provided to the credit reporting agencies by Capital One itself.

33.  Experian initially resolved Plaintiff's dispute by removing the fraudulent Capital One tradeline from his credit report. However, on January 30th, 2024, Capital One reinserted this tradeline. In an email, Experian explained that the request to block this information was based on a "material misrepresentation" by Plaintiff. It was also acknowledged in writing that the information was incorrectly blocked.

34.  Plaintiff again disputed the fraudulent account with Experian. However, Capital One "verified" the dispute to Experian as "accurate," so the reinserted, fraudulent account remained on Plaintiff's Experian credit report.

35.  On February 1, 2024, Plaintiff spoke to a woman in the Capital One Fraud Resolutions Department, as recommended by a Capital One representative the day before, to follow up on the case. Plaintiff was informed that it was waiting for Experian to send it documentation before making a decision. The representative stated that Capital One had received information from TransUnion and Equifax but were still waiting for Experian.

36.  On February 6, 2024, Plaintiff received another form letter dated February 1, 2024, indicating that a decision had been made by Capital One stating that the account was found not to be fraudulent and that he was liable for the debt.

37.  On February 12, 2024, Plaintiff received another form letter dated February 5, 2024, indicating that a decision had been made by Capital One stating that the account was found not to be fraudulent and that he was liable for the debt.

38.  Plaintiff sent two more detailed certified mail disputes to Capital One on February 12, 2024 (received by Capital One February 20) and February 20, 2024 (received February 27), enclosing the FTC affidavit, police report, and side-by-side bank statements proving he was in Oklahoma while fraudulent purchases were made in California, pleading with Capital One to correct this mistake. In his letters, Plaintiff asked that all telephone recordings with Capital One be preserved.

39.  On February 12th, 2024, Plaintiff sent a letter to Experian inquiring about where and how Experian obtained the false address and phone number listed on the credit application. Plaintiff also asked how this information had been reported to them and again requested the removal of the account.

40.  On or about February 13th, 2024, Plaintiff sent letters to Equifax and TransUnion requesting the same information that was requested in the letter to Experian. Plaintiff spoke to a representative who confirmed that they had received his letter. All letters included three enclosures: Plaintiff's police report, the FTC ID Theft report, and the affidavit submitted to Capital One.

41.  On March 12th, 2024, Plaintiff called Equifax because his credit file information was not visible on its website when logging into his account. The Equifax representative told Plaintiff that there was a security block on the account and that a signed letter, along with a pay stub and a copy of Plaintiff's driver's license, would need

to be mailed in to request the removal of the block. Plaintiff sent the letter on the same day.

42.  On March 20, 2024, Plaintiff received a letter from Equifax regarding the March 12th credit file that contained incorrect data. The address listed belonged to the suspect's address in Montclair, California. The date of birth was incorrect, and the last four digits of the SSN were also incorrect. Plaintiff called Equifax to request that this information be corrected, as it was not Plaintiff's. The Equifax representative claimed it was a "technical error" and assured that it would be corrected. He explained that there was another individual with the same name, and the distinction was made by Plaintiff's middle name. The credit file for ERIC ANTHONY MENENDEZ had the correct information, while the file for ERIC MENENDEZ did not. A dispute number of 240320-19613220 was issued, and Plaintiff was informed that an email confirming the correction would be received within 72 hours.

43.  On March 25th, 2024, Plaintiff spoke with a supervisor at Equifax, who explained that the technical team was still working on correcting the error regarding the accuracy of Plaintiff's information. The supervisor noted that this dispute inquiry concerning the inaccuracies was originally opened on February 12, 2024 and typically takes 30 days to resolve but can take up to 60 days. Plaintiff was informed that a confirmation email would be sent once the process was completed. The supervisor also stated that Plaintiff's information was listed accurately in their database, and if future lenders check against Equifax, the correct information should display for them, as it would be pulled from the database rather than the credit report.

44.  On April 1, 2024, Plaintiff called Experian and spoke with a representative named Hillary to inquire about the dispute. Hillary informed Plaintiff that investigations are conducted by creditors rather than Experian. When asked who reported the tradeline to Experian, she confirmed that it was Capital One. Plaintiff inquired whether Experian had received the letter, to which Hillary replied that it was received on February 20th. Regarding the actions Experian was taking, Hillary stated that since the Capital One account was no longer present on Plaintiff's credit report, there was no action to be taken. Plaintiff was also informed that Experian had previously emailed on February 22nd, explaining this situation.

45.  On April 30th, 2024, Plaintiff called Equifax again and spoke with a representative, who stated that they had not sent correspondence to Capital One as requested in Plaintiff's letter. This contradicted the information provided in the letter received from Equifax on February 23, 2024, which indicated that they would forward a copy of the documents Plaintiff had provided to each creditor for their review.

46.  On May 17th, 2024, Plaintiff noted that the suspect had been attempting to make monthly payments of $50, which were below the minimum payment due. On that same day, Plaintiff received a letter from Capital One indicating that the suspected thief's AutoPay service for the fraudulent credit card had been canceled as of May 11, 2024, due to a status change with the credit card account.

47.  On May 31st, 2024, Capital One sent Plaintiff an email from stating that the fraudulent account had been charged off.

48.  Following the charge-off, on June 3, 2024, Capital One sent Plaintiff a collection email regarding the fraudulent account which included a message indicating that it was an attempt to collect the debt and that any information obtained would be used for that purpose.

49.  From June through November 2024, Capital One sent Plaintiff more than 20 additional collection emails demanding payment on the $7,137.17 balance, despite the tremendous effort by Plaintiff to dispute the fraud.

50.  Plaintiff filed four CFPB complaints: January 23, 2025 (#250124-18283550); June 5, 2025 (#250605-21331641, rebuttal with 13 attachments); July 26, 2025 (#250726-22661503, including fraudster names); and July 27, 2025 (#250727-22679669, concerning tradeline reinsertion and geographic proof). Additionally, he filed a complaint with the Office of the Comptroller of the Currency (OCC) that was referred to the CFPB on or around July 22, 2025. In each instance, the CFPB closed his complaint without further action after receiving Capital One's written response indicating that the matter was deemed closed.

51.  Capital One denied the claims in responses dated March 19 and July 28, 2025, citing the same weak reasons related to "public records." Capital One even threatened to re-insert the fraudulent account onto Plaintiff's credit report if the account were to remain unpaid (a false threat as the account never re-appeared on his reports). Despite Plaintiff's efforts to address the issues, the responses he received from the creditor did not provide the resolution he sought.

52. Capital One then referred the account to their attorney. On April 14, 2025, Rausch Sturm, a national debt collection firm operating in multiple states including Oklahoma, sent Plaintiff a dunning letter demanding payment of $7,137.17. This letter, the initial letter from debt collector Rausch Sturm, provided Plaintiff until May 27, 2025, to dispute the amount being claimed against him by Capital One.

53. In response to this demand, Plaintiff engaged legal counsel, who, on April 29, 2025, sent the Rausch Sturm law firm a detailed letter reiterating that the account in question was fraudulent.

54. Rausch Sturm subsequently responded to Plaintiff's attorney with a letter dated May 23, 2025, requesting that Plaintiff submit a detailed fraud affidavit along with additional personal information. Although it is alleged that Capital One provided information to Rausch Sturm regarding the fraudulent account at the time of placement with the firm, by this letter, Rausch Sturm acknowledged that it had received counsel's notice that the account was the product of identity theft; Rausch Sturm therefore had actual notice of, and reason to know of, the fraudulent and disputed nature of the account no later than May 23, 2025 — more than two months before it filed and verified the state-court collection action.

55. On June 5, 2025, Plaintiff submitted another complaint to the CFPB regarding Capital One (Complaint 250605-21331641), rebutting their March 19, 2025 letter, which incorrectly concluded that Plaintiff owed the debt. Plaintiff felt it was important to include all relevant information regarding the case to ensure that it reached both the

CFPB and Capital One's legal department, which appeared not to have received it previously.  Capital One did not respond.

56.  On June 9, 2025, Plaintiff submitted a complaint form to the Social Security Administration regarding an unidentified individual that had been using Plaintiff's social security number for employment in the state of California.

57.  On July 11, 2025, Capital One mailed an identical letter to both Plaintiff and his legal counsel that stated that Capital One finished its investigation of Plaintiff's fraud claim and that, again, its "research found no signs of fraud."

58.  On July 22, 2025, Plaintiff submitted a complaint to the Office of the Comptroller of the Currency, referenced as OCC Complaint Case CS0388992.

59.  On July 22, 2025, upon believing his attorney had not sent information as requested, Plaintiff completed the new fraud affidavit that Rausch Sturm had requested in its May 23, 2025 letter and sent it via USPS Certified Mail to Rausch Sturm as part of a 106-page packet of supporting documentation, including an FTC report and a police report. Plaintiff also faxed the same documents to Rausch, Sturm. The certified letter was received by Rausch Sturm on July 25, 2025.

60.  On July 22, 2025, Plaintiff received a letter from the OCC regarding complaint #CS0388992. The letter stated that Plaintiff's complaint was against a financial institution with an asset size *over $10 billion*, and that the regulation in question falls under the primary responsibility of the CFPB. As a result, the OCC referred the complaint to the CFPB.

61.  **Ignoring Plaintiff's affidavit, less than two weeks later, Rausch Sturm filed a lawsuit against Plaintiff on August 4, 2025, in Oklahoma County District Court, claiming he opened and used the fraudulent Capital One account.** The Petition included a *sworn* statement on July 25, 2025, made under penalty of perjury, saying the claims against Plaintiff were true. Plaintiff was served with this lawsuit on September 1, 2025.

62.  Plaintiff was forced to hire new legal counsel, incurring fees, to assist him in preparing the Answer document that he filed with the court on September 15, 2025 regarding the fraudulent Capital One debt he did not owe. Counsel also prepared discovery requests related to the fraud, which were served on September 17, 2025. These requests sought specific information about the account and Capital One's investigation. However, Capital One never responded to Plaintiff's discovery requests.

63.  On October 13, 2025 and October 14, 2025, Rausch Sturm sent "validation" letters, each comprising 48 pages, that purported to verify the accuracy of the account and claimed Plaintiff's responsibility for the debt. Notably, these letters included account statements that ultimately supported Plaintiff's position, as they revealed that early statements (from September to December 2023) were mailed exclusively to the fraudster's California address, thereby proving that Plaintiff never received them. Plaintiff alleges that the reason why the address on the later statements changed is because Capital One used the address Plaintiff voluntarily provided to it as part of his fraud submission. It never conducted an investigation – it just updated the billing address on the fraudulent account to Plaintiff's address.

64.  On November 17, 2025, Capital One sent Plaintiff's counsel another validation letter, stating once again that there were "no signs of fraud." This letter was received on November 24, 2025.

65.  At the time the original Complaint was filed on December 22, 2025, the state-court collection action against Plaintiff in Oklahoma County District Court remained pending. On or about December 29, 2025—approximately one week after Plaintiff filed the original Complaint in this action—the Oklahoma County District Court collection action against Plaintiff was dismissed *with prejudice*. The dismissal with prejudice was a termination of that proceeding in Plaintiff's favor, and Capital One and Rausch Sturm obtained no judgment establishing that Plaintiff was responsible for the Fraudulent Account or any debt associated with it.

66. Defendants' refusal to recognize the fraud was not a good-faith mistake; it was knowing, malicious, willful, and in reckless disregard of the truth and of Plaintiff's rights. By no later than December 7, 2023, Capital One possessed Plaintiff's notarized fraud affidavit, his driver's license, his birth certificate, the Jones, Oklahoma police report (#2023-272), and three pages of his Experian credit report; it nonetheless issued a denial **that very day** and represented that the account had been "deemed not fraud" before its own staff had even processed the faxed packet. Capital One's own records identified four unknown names, a California address, and a California telephone number associated with the account, none of which belonged to Plaintiff, and Capital One's own billing statements showed the early statements were mailed only to the fraudster's Montclair, California address. Capital One refused to allow Plaintiff to record his calls, hung up on

him, and closed his case while his evidence sat unreviewed. After Experian properly deleted the fraudulent tradeline, Capital One reinserted it on January 30, 2024, and then "verified" the fraudulent tradeline to Experian as "accurate" despite knowing it was the product of identity theft. Rausch Sturm, with the July 25, 2025 fraud packet in hand, and at the direction of Capital One, caused a petition to be verified under penalty of perjury and filed suit ten days later. Each Defendant acted with knowledge of the falsity of its representations, or with reckless disregard for whether they were true, and with the intent to injure Plaintiff or with conscious indifference to the consequences of its conduct.

67.  Plaintiff's claims against Capital One that do not arise under the FCRA rest on conduct independent of Capital One's furnishing of information to the consumer reporting agencies—namely, the negligent opening of the Fraudulent Account in Plaintiff's name, the collection of a debt Capital One knew was not owed, the filing and prosecution of the state-court collection action, and Capital One's affirmative "zero liability" misrepresentations. To the extent any non-FCRA claim is alleged to involve information Capital One furnished to a consumer reporting agency, Capital One furnished that false information with malice and with willful intent to injure Plaintiff, as detailed throughout this pleading.

68. Capital One repeatedly and publicly represented, including through consumer-facing materials and through the November 21, 2023 FAQ enclosed in its own letter, that it maintained a "zero liability" policy and that consumers would not be held responsible for fraudulent or unauthorized charges that were promptly reported. Plaintiff relied on those representations. In specific and detrimental reliance on Capital One's "zero

liability" representations, Plaintiff chose to pursue and exhaust Capital One's internal fraud-dispute process—submitting affidavits, disputes, faxes, and certified-mail correspondence, and filing complaints with the CFPB and OCC—for 25 months, rather than immediately retaining counsel and filing suit. Had Capital One not represented that its "zero liability" policy would protect him, Plaintiff would not have invested that time, money, and effort in Capital One's process, and would have acted to protect his rights sooner. Plaintiff's reliance was reasonable and to his detriment, because Capital One never honored the policy on which it induced him to rely.

69.  The fraud against Plaintiff did not end when the original Complaint was filed; it has continued. On or about February 19, 2026, Plaintiff received an identity-theft-monitoring alert from his LifeLock identity-protection service notifying him that a new Capital One credit-card application had been submitted using his stolen Social Security number. On March 5, 2026, Plaintiff received a second LifeLock alert notifying him that yet another Capital One credit-card application had been submitted under his stolen Social Security number. These post-filing applications confirm that Plaintiff's identity remains compromised and that inaccurate or fraudulent information associated with Plaintiff continues to be generated and circulated in connection with Capital One, compounding Plaintiff's credit harm, anxiety, and distress and requiring Plaintiff to continue paying for identity-theft monitoring.

Separately, Plaintiff has since discovered that, beginning in December 2023, Capital One enrolled him — without his knowledge or consent — in its "CreditWise"

product and has used it to obtain his consumer reports on a recurring, monthly basis through 2026, as alleged in Counts Six and Seven below.

70.  All of this has caused Plaintiff significant harm. Plaintiff has spent many dozens of hours battling these fraudulent claims, and has incurred hundreds of dollars in costs for postage, printing, and credit-monitoring services such as LifeLock, including ongoing subscriptions. Plaintiff has also suffered substantial emotional distress as a direct and proximate result of Defendants' conduct. For more than 25 months, Plaintiff lived with persistent anxiety and worry about his credit standing and financial reputation, and about whether a debt he never incurred would prevent him from obtaining credit, or favorable terms in the future. Each new boilerplate denial, the reinsertion of the fraudulent tradeline, the charge-off, the recurring collection demands, and the collection lawsuit renewed his stress, frustration, and sense of helplessness, disrupted his sleep, and caused him embarrassment and humiliation at being treated as a delinquent debtor and at having to prove, again and again, that he was a victim. That distress is ongoing, as the identity thief has continued to target Plaintiff even after this action was filed.

## FIRST COUNT

### Violation of the Fair Credit Reporting Act (15 U.S.C. § 1681s-2(b)) Against Capital One

71.  Plaintiff re-alleges and incorporates all preceding factual allegations as if fully set forth herein.

72.  Capital One's conduct violated the Fair Credit Reporting Act ("FCRA"), which requires furnishers of credit information, upon notice of a dispute from a consumer

reporting agency ("CRA"), to: a) conduct a reasonable investigation of the disputed information; b) review all relevant information provided by the CRA or consumer; c) report the results of the investigation to the CRA; and d) correct or delete inaccurate information (15 U.S.C. § 1681s-2(b)(1)(A)–(E)).

73.   Capital One received multiple dispute notices following Plaintiff's disputes made to Experian and Equifax (e.g., tradeline deletions December 2023–March 2024) and directly from Plaintiff (e.g., November 28, 2023; February 12 and 20, 2024; CFPB complaints forwarded in 2025). Despite this, Capital One: a) failed to conduct a reasonable investigation; b) ignored overwhelming evidence of fraud, including the police report, FTC affidavit, geographic impossibility (Oklahoma vs. California transactions), and mixed or fraudulent addresses; c) issued repeated boilerplate denials, confirming the fraudulent tradeline; and d) reinserting the tradeline on January 30, 2024, after Experian had properly deleted it following Plaintiff's verified dispute.

74.   Capital One's reinsertion constitutes an additional and separate FCRA violation. Each act of reinsertion of inaccurate information is independently actionable and demonstrates willful disregard for Plaintiff's rights.

75.   By failing to review all relevant information, misrepresenting the results of its investigation to the CRAs, and continuing to report inaccurate information, Capital One willfully and recklessly violated 15 U.S.C. § 1681s-2(b).

76.   Capital One's violations of the FCRA were committed with malice and with willful intent to injure Plaintiff. As alleged above, Capital One possessed Plaintiff's notarized fraud affidavit, his driver's license and birth certificate, the police report, the

FTC affidavit, and proof of geographic impossibility, and Capital One's own records reflected the fraudster's California address, California telephone number, and four unknown names; nonetheless Capital One verified the fraudulent tradeline to Experian as "accurate." Capital One's continuing course of conduct, including the post-filing submission of new fraudulent Capital One credit-card applications under Plaintiff's stolen Social Security number on or about February 19, 2026 and March 5, 2026, further confirms the continuing inaccuracy and the willful and reckless character of Capital One's reporting conduct.

77. As a direct and proximate result of Capital One's violations, Plaintiff suffered actual damages, including but not limited to: a) out-of-pocket expenses for postage, printing, credit monitoring (including an ongoing LifeLock identity-theft-monitoring subscription), and legal advice; b) over 100 hours of lost time disputing fraudulent information; c) damage to credit reputation and creditworthiness; and d) emotional distress, embarrassment, humiliation, anxiety, and frustration caused by repeated "brick wall" responses from Capital One and inaccurate reporting to CRAs.

78. Capital One's conduct was willful and reckless, entitling Plaintiff to: a) actual damages; b) statutory damages of not less than $100 and not more than $1,000 per violation (§ 1681n); c) punitive damages; d) costs and reasonable attorney's fees; and e) such other and further relief as the Court deems just and proper.

79. Each failure to comply with the FCRA — including each failure to conduct a reasonable investigation, each misrepresentation to a consumer reporting agency, and each reinsertion of the fraudulent tradeline — is a separate, actionable violation, and

Plaintiff is potentially entitled to multiple awards of statutory damages for the multiple violations.

## SECOND COUNT

### Violation of the Fair Debt Collection Practices Act (15 U.S.C. §§ 1692e, 1692f, 1692g) Against Rausch Sturm

80. Plaintiff re-avers and incorporates all other factual allegations set forth in this Complaint.

81. The debts sought to be collected were defaulted, consumer debts, including food purchases, consumer electronic purchases, and other consumer items.

82. Rausch Sturm's conduct violated the Fair Debt Collection Practices Act (FDCPA), which prohibits debt collectors from using any false, deceptive, or misleading representation or means in connection with debt collection (15 U.S.C. § 1692e).

83. Rausch Sturm falsely represented the character, amount, and legal status of the debt in its April 14, 2025 dunning letter, the August 4, 2025 lawsuit petition (verified under penalty of perjury despite knowledge of fraud), and October 13/14, 2025 validation letters (showing early statements mailed to fraudulent California address, contradicting claims Plaintiff opened/used the account).

84. Rausch Sturm's actions—ignoring counsel's April 29, 2025 fraud notice (which Rausch Sturm acknowledged in its own May 23, 2025 letter) and the July 22, 2025, 106-page fraud packet (including police report, FTC affidavit, and credit reports showing tradeline removal), then filing and prosecuting the lawsuit—were deceptive and

misleading, as they implied a valid debt despite clear, overwhelming evidence of identity theft.

85.  As a result of Rausch Sturm's violations of the FDCPA, Plaintiff suffered actual damages, including but not limited to: legal fees for state court defense; emotional distress, embarrassment, humiliation, and frustration from baseless litigation.

86.  Rausch Sturm's conduct was willful and reckless, entitling Plaintiff to actual damages, statutory damages up to $1,000 (15 U.S.C. § 1692k), costs, attorney fees, and such other relief as deemed appropriate.

87.  Rausch Sturm's conduct additionally violated 15 U.S.C. § 1692f of the FDCPA, which prohibits debt collectors from using unfair or unconscionable means to collect or attempt to collect any debt (15 U.S.C. § 1692f).

88.  Rausch Sturm unfairly pursued collection by filing the August 4, 2025 lawsuit after receiving irrefutable fraud evidence, providing self-contradictory validation (mixed addresses), sending duplicate letters (October 13/14), and stonewalling September 17, 2025 discovery requests (unanswered as of December 19, 2025).

89.  These acts were unconscionable, as Rausch Sturm knew or should have known the debt was invalid based on the police report, geographic proof, and Capital One's own statements showing California mailings, yet proceeded to harass Plaintiff through litigation.

90.  As a result of Rausch Sturm's violations of the FDCPA, Plaintiff suffered actual damages, including but not limited to: legal fees for state court defense; emotional distress, embarrassment, humiliation, and frustration from baseless litigation.

91. Rausch Sturm's conduct was willful and reckless, entitling Plaintiff to actual damages, statutory damages up to $1,000 (15 U.S.C. § 1692k), costs, attorney fees, and such other relief as deemed appropriate.

92. Rausch Sturm's conduct violated the FDCPA, which requires debt collectors to cease collection if the consumer disputes the debt in writing within 30 days until verification is obtained and mailed (15 U.S.C. § 1692g(b)).

93. Plaintiff disputed the debt in writing within the validation period: Rausch Sturm's April 14, 2025 dunning letter allowed until May 27, 2025 to dispute, and Rausch Sturm admits it received counsel's written notice that the Account was fraudulent no later than May 22, 2025. Rather than cease collection and obtain and mail verification, Rausch Sturm filed the August 4, 2025 lawsuit (October validation contradicted its claims with California addresses).

94. Rausch Sturm's failure to cease and provide accurate verification was unfair, as it ignored evidence like the police report and FTC affidavit, proceeding despite knowledge the debt was disputed as fraudulent.

95. As a result of Rausch Sturm's violations of the FDCPA, Plaintiff suffered actual damages, including but not limited to: legal fees for state court defense; emotional distress, embarrassment, humiliation, and frustration from baseless litigation. Rausch Sturm's conduct was willful and reckless, entitling Plaintiff to actual damages, statutory damages up to $1,000 (15 U.S.C. § 1692k), costs, attorney fees, and such other relief as deemed appropriate.

**THIRD COUNT**

**Violation of the Fair Credit Billing Act (FCBA), 15 U.S.C. §§ 1666 and 1666a
Against Capital One**

96.  Plaintiff re-avers and incorporates all other factual allegations set forth in this Complaint.

97.  The Fair Credit Billing Act (FCBA), 15 U.S.C. § 1666, requires creditors of open-end credit accounts, upon receipt of a timely written notice of a billing error, to: (a) acknowledge the dispute in writing within 30 days; (b) conduct a reasonable investigation of the disputed charges; and (c) within 90 days (or two billing cycles, whichever is shorter), either correct the billing error or provide a written explanation of why the creditor believes the billing statement is correct.

98.  Plaintiff is a person whom Capital One has treated and pursued as the obligor and cardholder on the Account, and the FCBA's protections extend to a consumer the creditor claims is obligated on the account, regardless of whether the consumer in fact authorized it. Plaintiff timely notified Capital One of the billing error—that the entire Account and all associated charges were unauthorized and the product of identity theft—through multiple written disputes, including correspondence dated November 28, 2023, February 12, 2024, and February 20, 2024, and through the disputes and complaints forwarded to Capital One thereafter. To the extent the sixty-day notice period is measured from Plaintiff's receipt of a periodic statement reflecting the billing error, that period never began to run, because Capital One mailed the September–December 2023 statements exclusively to the fraudster's Montclair, California address and Plaintiff never received them.

99.  Capital One failed to comply with its obligations under the FCBA by: (a) failing to conduct a reasonable investigation; (b) issuing conclusory, boilerplate denials that ignored Plaintiff's evidence of fraud, geographic impossibility, and police/FTC reports; (c) failing to correct or remove unauthorized charges; (d) continuing to assess finance charges, fees, and amounts allegedly due; and (e) continuing to treat the account as valid and delinquent despite clear notice that it was unauthorized.

100.  While Plaintiff's billing-error disputes were pending and unresolved, Capital One violated 15 U.S.C. § 1666(c) by attempting to collect the disputed amount while the billing-error dispute remained pending and unresolved—including by demanding payment, assessing late fees and penalty interest, and ultimately causing a collection lawsuit to be filed. Separately, Capital One violated 15 U.S.C. § 1666a by reporting the disputed Account as delinquent to the consumer reporting agencies while the billing-error dispute remained unresolved, and without disclosing that the amount was disputed. These collection-during-dispute and adverse-credit-reporting violations are independent of, and accrue separately from, any procedural violation under § 1666(a), and each accrued when Plaintiff discovered it and was committed and repeated on multiple occasions within one year before this action was filed on December 22, 2025—including, without limitation, Capital One's continued demands for payment, the July 11, 2025 denial, the August 4, 2025 verified collection petition, the October 13–14, 2025 "validation" mailings, and the November 17, 2025 denial. Each such act is a separate and independently actionable violation.

101.  Plaintiff did not discover the Fraudulent Account until November 16, 2023, and the FCBA—remedial consumer-protection legislation—is construed liberally in favor of the consumer. Capital One's repeated, post-dispute efforts to enforce and collect the disputed Account did not merge into a single violation; each renewed demand, each delinquency report, and the collection suit itself was a discrete violation that gave rise to a separate limitations period. A creditor that is put on notice of a disputed charge may not ignore the dispute, run the limitations clock, and then collect the disputed amount free of FCBA liability.

102.  Capital One further violated 15 U.S.C. § 1666(a)(3)(B)(ii) by failing to provide a clear, meaningful written explanation of the basis for its denials, issuing at least eleven (11) repetitive letters that did not identify the evidence relied upon or explain why the charges were allegedly authorized.

103.  As a direct and proximate result of these procedural violations, Plaintiff suffered actual damages, including: out-of-pocket expenses exceeding $500; over 100 hours addressing the fraudulent account and disputes; harm to credit reputation and creditworthiness; and emotional distress, embarrassment, humiliation, and frustration.

104.  Capital One's conduct was willful, knowing, and reckless, entitling Plaintiff to: actual damages, statutory damages equal to twice the finance charge, costs, attorney's fees, and such other relief as the Court deems appropriate.

## FOURTH COUNT

### Malicious Prosecution Against Both Defendants

105.  Plaintiff re-avers and incorporates all other factual allegations set forth in this Complaint.

106.  Defendants' conduct constitutes malicious prosecution under Oklahoma common law, requiring: (1) initiation of an action; (2) termination of that action in Plaintiff's favor; (3) lack of probable cause; (4) malice; and (5) damages.

107.  Defendants initiated the Oklahoma County District Court collection action against Plaintiff on August 4, 2025. They did so without probable cause, having ignored overwhelming proof of fraud, and with malice and willful disregard of the truth. Capital One, which placed the Account for collection knowing it was the product of identity theft and which directed and ratified the suit, is liable as principal for the malicious prosecution carried out by its agent Rausch Sturm. No reasonable creditor or collector in possession of the July 25, 2025 fraud packet—which included the FTC affidavit and the Jones, Oklahoma police report—could have entertained an honest and reasonable belief that Plaintiff owed the debt. Moreover, Rausch Sturm had received counsel's April 29, 2025 letter and, by its own May 23, 2025 letter, acknowledged notice that the account was fraudulent — giving it reason to know the debt was not owed more than two months before it filed suit on August 4, 2025. Malice is shown by the petition verified under penalty of perjury, the eleven-letter form-denial campaign, the self-contradictory October 2025 validation letters, and Defendants' refusal to respond to Plaintiff's state-court discovery.

108.  The Oklahoma County District Court collection action terminated in Plaintiff's favor. On or about December 29, 2025, that action was dismissed with

prejudice, without any judgment that Plaintiff owed the Fraudulent Account or any associated debt. A dismissal with prejudice is a termination on the merits in Plaintiff's favor and satisfies the favorable-termination element of this claim.

109.  As a result of Defendants' malicious prosecution, Plaintiff suffered actual damages, including but not limited to: legal fees; emotional distress, embarrassment regarding the public record, humiliation, and frustration.

110.  Defendants' conduct was malicious, entitling Plaintiff to actual damages, punitive damages, costs, and such other relief as deemed appropriate.

## FIFTH COUNT

### Negligence Against Capital One

111.  Plaintiff re-avers and incorporates all other factual allegations set forth in this Complaint.

112.  Plaintiff asserts a claim for common-law negligence. The elements of common-law negligence under Oklahoma law are: (1) a duty owed by the defendant to protect the plaintiff from injury; (2) a breach of that duty; (3) causation; and (4) injury.

113.  Capital One owed Plaintiff a duty to exercise reasonable care to verify the identity of any applicant before issuing credit in Plaintiff's name, because a card issuer is the first, and often the last, line of defense against the foreseeable and devastating harm caused by identity theft. Capital One breached that duty by opening the Fraudulent Account in Plaintiff's name for an imposter—on an application bearing a California address, a California telephone number, and identifying information that did not match Plaintiff—without reasonably verifying that the applicant was Plaintiff. This negligent

opening of the Account occurred before, and wholly independent of, any duty Capital One owed as a furnisher of information to the consumer reporting agencies; it is therefore not "the subject matter regulated under section 1681s-2" and is not preempted by 15 U.S.C. § 1681t(b)(1)(F) or § 1681h(e). Capital One's negligence directly and proximately caused Plaintiff's injuries, including the 25-month ordeal, credit harm, out-of-pocket costs, lost time, and emotional distress alleged herein.

114. As a result of Capital One's negligence, Plaintiff suffered actual damages, including but not limited to: out-of-pocket expenses exceeding $500; many dozens of hours of lost time; credit harm; emotional distress, embarrassment, humiliation, and frustration.

115. Capital One's conduct was negligent and reckless, entitling Plaintiff to actual damages, punitive damages, costs, and such other relief as deemed appropriate.

## SIXTH COUNT

### Violation of the Fair Credit Reporting Act — Impermissible Access (15 U.S.C. § 1681b(f)) Against Capital One

116. Plaintiff re-avers and incorporates all other factual allegations set forth in this Complaint.

117. The FCRA prohibits any person from using or obtaining a consumer report for any purpose unless the report is obtained for a purpose authorized under 15 U.S.C. § 1681b. 15 U.S.C. § 1681b(f).

118. Beginning in or about December 2023 — at the height of Plaintiff's fraud disputes — Capital One caused Plaintiff to be enrolled in "CreditWise," Capital One's

consumer credit-monitoring product, without Plaintiff's knowledge, application, or consent. Plaintiff never signed up for, requested, or authorized any CreditWise account. Plaintiff began receiving CreditWise emails addressed to him on or about December 20, 2023, and continuing through 2026, none of which he ever requested.

119.  Using that unauthorized "CreditWise" enrollment as a vehicle, Capital One obtained Plaintiff's TransUnion consumer report on a monthly basis for more than two years — at least twenty-seven times between June 18, 2024 and June 17, 2026, each appearing as "via CreditWise CAPITAL1." Capital One also obtained Plaintiff's Equifax consumer report (including on November 25, 2025 and January 27, 2026) and obtained Plaintiff's TransUnion report directly (including on December 21, 2025).

120.  Capital One had no permissible purpose to obtain any of these reports. Plaintiff has no account with Capital One; the only account Capital One ever claimed — the Fraudulent Account — was the product of identity theft, was charged off, and was the subject of a collection action that was dismissed with prejudice on December 29, 2025. Capital One's pulls nonetheless continued every month after that dismissal (including on or about January 27, January 28, February 24, March 25, April 22, May 20, and June 17, 2026), when no account, debt, or litigation remained to review or collect.

121.  Capital One thereby obtained Plaintiff's consumer reports without a permissible purpose under § 1681b, in violation of 15 U.S.C. § 1681b(f).

122.  Capital One's conduct was willful. It cloaked its repeated, creditor account-review access behind a "CreditWise" consumer-monitoring enrollment Plaintiff never

made, concealing the nature and frequency of its access, and it continued to obtain his reports long after any conceivable permissible purpose had ended.

123.  Each unauthorized obtaining of a consumer report is a separate, actionable violation. As a direct and proximate result, Plaintiff suffered injury, including the invasion of his privacy interest in his consumer file, anxiety and distress from the repeated and secret surveillance of his credit, and the cost and burden of monitoring for and disputing the unauthorized inquiries.

124.  Plaintiff is entitled to actual damages (15 U.S.C. § 1681o), statutory damages of not less than $100 and not more than $1,000 per violation and punitive damages for willful noncompliance (15 U.S.C. § 1681n), costs and reasonable attorney's fees, and such other relief as the Court deems just and proper.

## SEVENTH COUNT

### Intrusion Upon Seclusion Against Capital One

125.  Plaintiff re-avers and incorporates all other factual allegations set forth in this Complaint.

126.  Under Oklahoma common law, a defendant is liable for intrusion upon seclusion where: (1) the defendant intentionally intruded, physically or otherwise, upon the solitude or seclusion, or the private affairs or concerns, of the plaintiff; (2) the intrusion would be highly offensive to a reasonable person; and (3) the intrusion caused the plaintiff injury.

127.  Plaintiff's consumer credit file is private. Capital One intentionally intruded upon Plaintiff's private affairs by repeatedly obtaining his consumer reports — at least

twenty-seven times from TransUnion and additional times from Equifax — without his authorization and without any permissible purpose, and by enrolling him in a "CreditWise" account he never requested in order to access and monitor his credit.

128. This claim is independent of, and does not arise from, any furnishing of information by Capital One to a consumer reporting agency; it concerns solely Capital One's unauthorized obtaining of Plaintiff's consumer reports, and is therefore not preempted by 15 U.S.C. § 1681t(b)(1)(F) or § 1681h(e).

129. A reasonable person would find Capital One's repeated, secret, and unauthorized monitoring of his private credit file — continuing even after the fraudulent debt was dismissed with prejudice — highly offensive.

130. Capital One's intrusion caused Plaintiff injury, including the violation of his privacy, anxiety and distress, and the ongoing burden of detecting and disputing the unauthorized access.

131. Capital One's conduct was intentional, willful, and in reckless disregard of Plaintiff's rights, entitling Plaintiff to actual damages, punitive damages, costs, and injunctive relief barring Capital One from continuing to obtain his consumer reports without a permissible purpose.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Eric Menendez, respectfully prays for judgment against Defendants Capital One, N.A. and Rausch Sturm LLP, as follows:

A. On the Fair Credit Reporting Act claim (15 U.S.C. § 1681s-2(b)) against Capital One:

Actual damages pursuant to 15 U.S.C. § 1681o; Statutory damages of not less than $100 and not more than $1,000 per violation pursuant to 15 U.S.C. § 1681n; Punitive damages for willful noncompliance pursuant to 15 U.S.C. § 1681n; Costs of suit and reasonable attorney's fees pursuant to 15 U.S.C. §§ 1681n and 1681o.

B. On the Fair Debt Collection Practices Act claims (15 U.S.C. §§ 1692e, 1692f, and 1692g(b)) against Rausch Sturm: Actual damages pursuant to 15 U.S.C. § 1692k(a)(1); Statutory damages of up to $1,000 pursuant to 15 U.S.C. § 1692k(a)(2)(A); Costs of suit and reasonable attorney's fees pursuant to 15 U.S.C. § 1692k(a)(3).

C. On the Fair Credit Billing Act claim (15 U.S.C. §§ 1666, 1666a, and 1640) against Capital One: Actual damages pursuant to 15 U.S.C. § 1640(a)(1); Statutory damages pursuant to 15 U.S.C. § 1640(a)(2)(A)(iii), equal to twice the amount of any finance charge (not less than $500 and not more than $5,000), for each of Capital One's separate violations of the Fair Credit Billing Act—including each act of collecting or attempting to collect the disputed amount and each report of the disputed Account as delinquent—Plaintiff's recovery not being limited to a single statutory penalty under § 1640(g), because these affirmative violations are not failures to disclose;  Declaratory relief that Plaintiff is not liable for the fraudulent account or charges; Costs of suit and reasonable attorney's fees pursuant to 15 U.S.C. § 1640(a)(3).

D. On Plaintiff's Oklahoma common-law claims (malicious prosecution against both Defendants, and negligence against Capital One): Compensatory damages, including special damages; Punitive damages for willful, reckless, or malicious conduct; Costs and any other relief permitted under Oklahoma law.

E. On the Fair Credit Reporting Act impermissible-access claim (15 U.S.C. § 1681b(f)) against Capital One: Actual damages pursuant to 15 U.S.C. § 1681o; Statutory damages of not less than $100 and not more than $1,000 per violation pursuant to 15 U.S.C. § 1681n; Punitive damages for willful noncompliance pursuant to 15 U.S.C. § 1681n; Costs of suit and reasonable attorney's fees pursuant to 15 U.S.C. §§ 1681n and 1681o.

F. On the intrusion-upon-seclusion claim against Capital One: Compensatory damages; Punitive damages for intentional, willful, and reckless conduct; Costs and any other relief permitted under Oklahoma law.

G. Injunctive and equitable relief, including but not limited to: An order requiring Capital One to correct and permanently delete any inaccurate credit reporting related to the fraudulent account; An order barring Defendants from further collection, litigation, or reporting activity related to the fraudulent debt; an order barring Capital One from obtaining or using any consumer report concerning Plaintiff without a permissible purpose under 15 U.S.C. § 1681b; and a declaration that Plaintiff owes no debt to Capital One and that Capital One has no permissible purpose to obtain Plaintiff's consumer reports.

H. Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

/s/ Victor R. Wandres
Victor R. Wandres, OBA #19591
PARAMOUNT LAW
1202 E. 33rd Street
Tulsa, OK 74105
(918) 200-9272  voice
(918) 895-9774  fax
victor@paramount-law.net
Attorney for Plaintiff Eric Menendez